May it please the Court, Counsel. I am here on behalf of Dr. Abdul Buridi, who was one of 30 physician investors in a hospital project in southern Indiana. Dr. Buridi filed this lawsuit to bring two claims against the bank that provided the construction loan to build the hospital project. The claims are fraud and breach of implied covenant of good faith and fair dealing. Misrepresentation in this case was contained in the bank's loan commitment letter, which was provided to Dr. Buridi in order to obtain his promise to provide a personal guarantee of the debt. What's your best case you're going on in this to show that when the bank required a guarantee like this that it would be fraud by saying it's going to be a 60-bed hospital or something of that nature? It must be a real good case you're depending upon. The cases that we would bring to the Court's attention are Republic Bank v. Bear Stearns, which held that where the information available to the fraud plaintiff would not have revealed the falsity of the representation that the plaintiff could proceed on a fraud theory. Also the case of Moore, Owen, Thomas & Co. v. Coffey, another Sixth Circuit case, which held that the question of what constitutes common sense or reasonable diligence under Kentucky law is properly a question for the jury. In this case, it's undisputed that Dr. Buridi's hospital was going to be only 34 beds. But that doesn't mean, does it, that he could not have, with reasonable diligence, have gotten that information? And further, isn't it the fact that while the hospital opened, I think, with 34 beds, that there was at least a shell of a building that could be operational at 60 beds, should they ever build it out that far? Wasn't that the case? It is the case that the wing that was shelled was constructed with exterior walls. There were just no interior fittings such that there could be revenue-producing beds in that wing of the hospital. Could they have opened 60 beds without a special authority from the state? A lot of states have that, especially Kentucky, but this is in Indiana. You have to have a certificate of need in order to have so many beds. Is that required in Indiana? Licensing is required for all beds that you would open. There's been no evidence that there was a problem with licensing in this case. Did they ever have authority for 60 beds when all this went on? I don't think they did, did they? No. As I understand it, the permits and licensing is applied for as you intend to use the beds. So they had permits for the beds that they did open. They had permits for what, up to 32 or 34 beds? Thirty-four beds. You couldn't do 60 unless they went through a certificate of need or whatever it's called in Indiana? That is correct, but they also couldn't do 60 because the interior structure of the building was not ever constructed. But it wouldn't be any good to have the bed if you don't have authority to fill the bed, would it? No, but I don't think there would have been any problem getting authority to fill the bed in this case. Did they ever get authority for 60? They haven't yet built out the E-wing as far as I understand it. So the problem in this case is that the bank knew that that wing of hospital would be shelled. My client did not know that, did not have possession of any documents that would have revealed that to him. Was your client a shareholder in the corporation that was going to build it? He was. He had access to the information that that corporation wanted to borrow the money from the bank in order to build this hospital, right? That's correct. And so he was entitled to know what the corporation knew. He was a less than one percent investor in the hospital. But still, he was a shareholder, right? He was a shareholder, and that's been the dispute between the parties. The bank has suggested that under Kentucky law, the obligation to exercise common sense included an obligation for Dr. Breed to demand construction plans, blueprints, the agreement with the contractor. These are the only things that would have revealed that the hospital was going to be built with materially less than 60 beds. We submit that that's not required under Kentucky law. Isn't the question, doesn't the question focus on justifiable reliance? It does. Okay, and so the argument is what justified your client, and I take it your argument is your client, the representation in itself is enough for him to be justified in relying there on. It is, Your Honor. There is no duty to look behind that. Well, he had no reason to question that representation. It was consistent with everything else that he'd been told about the project. So it was something that he understood to be a certainty. So when he saw that the hospital was described as having 60 beds in a loan commitment letter, no flags were raised for him. He had no reason to question that. The district court and the bank have suggested that despite not having any reason to question that, in order to maintain a fraud claim, he would have had to go out and affirmatively try to obtain additional documents and other things that weren't made available to him in the nature of blueprints or construction plans, which would have shown that the hospital was going to be built. But, you know, there's no showing in the record that, in addition to this not getting documents, that he asked probing questions that would have gotten to this. There's no allegation that he asked for information and was either not provided it or was given false or fraudulent information, is there? No, Your Honor, there's not. The bank has suggested that he could have had full access to this information and would have had this information if he had subjected this investment to the same type of diligence that he used in his other investments. In this particular case, he took on the position, really, of a passive investor. He was. It's just like a hope that it's all going to work out, and then it didn't. Well, I would characterize it as a reasonable expectation that this project was going to be built in accordance with his understanding of what it was, a 60-bed hospital that would have generated sufficient revenue to meet this debt obligation. Instead, there's no hope that this hospital could have repaid this debt. The bank knew that or should have known that based on its reckless approval of the loan, based on financial projections for a 64-bed hospital, knowing that only 34 beds would be built. The number of beds is the key input in revenue projections for a hospital. It's the only way the hospital makes money is by treating patients. So this, we contend, was both fraudulent and a breach of the implied covenant of good faith and fair dealing to obtain this guarantee in circumstances that contained an inevitable default, which is a risk that a guarantor would not reasonably anticipate. The district court judge who denied BB&T's motion to dismiss under Rule 12b6 agreed. A different judge who had been assigned to the case subsequently disagreed and granted the bank's motion for summary judgment dismissal. So this is not a case where we failed in improving our allegations. This is a situation where there's certainly evidence creating material issues of fact on all required elements of our claims. We believe the district court acted improperly in resolving some of those questions as a matter of law. The issue of justifiable reliance on our fraud claim in particular is something that is generally not susceptible to resolution as a matter of law. Would your claim be the same if your client had owned, say, 40% of the corporation or 60% of the corporation? Or is it the same anyway? Because he signed the guarantee agreement and he was defrauded by the bank. It would be the same, I think, Your Honor. Although this case is certainly different than a lot of the cases you see in this area where there are one or two guarantors who are also the managers of the project. It's true that he's a less than 1% owner, a passive investor. However, we believe under applicable Kentucky law, even in the case of a 40% investor, where the bank knows something that the guarantor does not and represents as such to the guarantor in order to induce signing of the guarantee, that the question of reliance should be a question of fact for the jury. But don't we have to assume that the corporation knows that they can't put 60 beds in there until they get a certificate of need or authority from the state? That would be known by a medical group, right? It would, yes. And again, that was never an obstacle for this hospital. The beds that were built were licensed and have been generating revenue. Did they ever fill capacity with the 34 beds? I know they did 34 and then they added eight more, right? They did open the hospital in what's been called a slow open process, which is typical, as I understand it, for these projects. And that's in part due to the licensing requirements. You have to be running a couple of beds before the authorities can come in and evaluate how you're doing that to issue additional licenses. There was a slow open. I think what the record shows is that as additional beds were open, more patients came in. It's essential to understand that a hospital can never achieve 100% occupancy. The bank's own witnesses testified that a good occupancy rate would be 50, 60%. The record in this case shows that the hospital filled 66% of the beds that were built. So the bank's own expert report identified data which reflects that with more beds came more patients and more revenue. And so we believe that there's certainly a jury question as to causation on our fraud claim. Because the reduction in the number of beds was a substantial factor in the hospital's inability to pay the loan. Did the hospital ever fill up all the beds that they did build? Did they ever achieve 100% occupancy? Yeah, 100%. They never did, did they? Before they went under. It's impossible to achieve 100%. I know that. They didn't even get 90%, did they, or 80%? No, they did not. In the window of time that we had data introduced into the record for, the occupancy rate was 66%. So in this case, tell me, again, the relief that your client seeks. If your client wins, what does your client want? To go back and go to trial? I mean, what is it that, how does victory look for you at this level? Yes, we would like the opportunity to present our case to a jury, Your Honor. The damages that we would seek would be the monies that Dr. Brady has had to pay on his guarantee obligation. And just for my own information, were there any attempts prior to argument today to try to resolve this through alternative dispute resolution? We have never engaged in formal alternative dispute resolution. We did, we have had settlement discussions on numerous occasions. But nothing fruitful. Thank you. Did you reserve time? Three minutes, yeah. See you back again. May it please the court? Opposing counsel? Your Honor, I'm Lisa DiGiacco. I'm here today on behalf of BB&T. Your Honor, so the district court was right when it granted summary judgment in this case. Judge Hale was correct to find, as a matter of law, that Dr. Brady could not sustain a claim on either of the two causes of action remaining to him in this case. Fraud and breach of the implied duty of good faith and fair dealing. When we moved for summary judgment, BB&T met its initial burden of identifying the parts of the record. One judge thought it wasn't as a matter of law, right? Well, I would disagree with that, Your Honor. I would take issue with Ms. Hinkle's statement that Judge Simpson found that it wasn't something to be determined as a matter of law. That was a motion to dismiss. And as Your Honor is aware, the standard is different. Yes, so Judge Simpson determined that it was appropriate to allow the plaintiff to go forward and see if there could be any additional evidence uncovered that might support a claim that BB&T had actually breached its duty of good faith and fair dealing in the execution of the contract. Or not the execution, but the performance of the contract. That is what the law requires. And after discovery was completed, Judge Hale reviewed the record, considered the evidence that both parties had collected, and determined, in fact, that Dr. Buriti had failed to meet his burden and could not identify any conduct by BB&T in the performance of either the loan commitment letter or the guarantee agreement that indicated. So counsel has said that there were no documents provided to Mr. Buriti that indicated that the hospital was not going to open with 60 beds, that he had no way of getting this information reasonably, that he was justifiable in his reliance on what he was told in the original contracting phase. So why doesn't that present a genuine issue of material fact that's appropriate for a trier of fact, a jury, to decide? Yes, Your Honor. I think that the answer is found in the district court opinion, where the district court concludes that Dr. Buriti was not reasonable in relying on the bank to provide him with information that the bank received from Dr. Buriti's own partners. All of the information that Dr. Buriti... So is reasonableness a legal question or a fact question? According to the case law, although reliance is often a question of fact for a jury, when no reasonable fact finder could conclude from the evidence that the plaintiff was justified in relying on the alleged misrepresentation, it is a decision to be made as a matter of law. There are multiple... What is it about this case that says that, other than the district court's decision, what is it about the facts of this case that says no reasonable fact finder could differ with this particular interpretation or outcome? Dr. Buriti's own testimony, which indicates that he did not review the offering memorandum for investors, the budget, the pro forma, the operating agreement, the partnership agreement between Kentuckiana Investors, in which he was a partner, and its partner, CHA, Cardiovascular Hospitals of America, the construction agreement, the construction bids, the construction plans, any of the materials that were available to his partners that his partners provided to the bank, which Dr. Buriti argues... When you say partners, these are fellow investors? Yes. Or these are partners in one of his many business deals? These are his partners in Kentuckiana Investors, in KI, which was one of the two entities... Were there... How many investors this was? He was one share? He was one... He had one share in the total, and I'm actually not sure what the total number of shares was, but his... Anything... I mean, round numbers. Is it 50? I'd say between 20 and 40. Yeah, it's a number in the 30s, I believe. Did the bank require guarantee agreements from other people who were investors in this court? Indeed, Your Honor. In fact, I believe each of... And that's where I'm getting the 20 to 40 numbers. We're calling the number of the list of guarantors that is included in the loan commitment letter. Virtually every investor was required to guarantee some portion of the amount, and nearly the total amount of the loan that BB&T extended for the construction of this hospital was guaranteed by the individual doctor investors. Kind of a standard procedure for banks when they have a corporation that's not been around a while, right? And I would suggest, Your Honor, that it is an indication to Dr. Buriti that the bank feels the need to be further protected in connection with this venture, which is a new venture. I want to go back to... I'm sorry. Sure. Buriti is the only plaintiff, only person who sued on this? That's right, Your Honor. As among the 30 or so... That's right, Your Honor. The other doctor investors in KI,  Does everybody have to come up with money? That's right, Your Honor. For everybody to satisfy their guarantee? BB&T sold the guarantees to a distressed loan investor, so I'm not familiar with exactly what the details were of how they were resolved. BB&T sold the guarantees to a distressed loan investor who proceeded to collect on those guarantees. And there was litigation about the enforcement of those guarantees. Dr. Buriti litigated that extensively in the state courts in Indiana, and he lost. Only after, and one of our arguments in the court below on the motion to dismiss states was that res judicata should bar Dr. Buriti from proceeding in this matter against the bank. The court determined that that was not appropriate in connection with the claims that we're still litigating here in this court. I want to go back to the litany of documents that you mentioned were available. Are you saying that those documents were... How were those documents made available to Dr. Buriti? Presumably, Dr. Buriti could have requested any of those documents. He testified that some of them were things that were passed around at investor meetings. He briefly looked at them, but he didn't have any copies of his own. He didn't ask for other documents, he said, despite the fact that his own testimony reveals that in investments of similar kinds into commercial construction projects, he testified he carefully looks at all of these documents and understands how important they are. So you say he was a sophisticated investor? He was a sophisticated investor, Your Honor, and the district court specifically held that Dr. Buriti's extensive experience as a businessman, his business acumen and considerable advisory resources were critical to the holding that his reliance was not justifiable. Dr. Buriti was not new to being a partner. He had been a limited partner and a general partner in a number of ventures, ranging from dialysis clinics to hair salons to hotels to commercial office buildings. When I reviewed Dr. Buriti's deposition transcript before this hearing today, I was struck to realize that it had taken me nearly an hour to ask Dr. Buriti about all of his other business ventures outside of his medical practice. It's 44 pages of his deposition transcript. It's clear that Dr. Buriti had considerable experience as a businessman, and he testified himself that, as a rule, he's very successful. He says he has a native talent for business, he's diligent in investigating things, he has on-the-job experience, and furthermore, he has a long list of professional advisors upon whom he relies in connection with his decisions to invest. He has an attorney... Where did this 60-bed facility come from? Was it something that the bank put in there, or did the corporation request this, or the partnership, or whatever it was called, the business entity? There's a statement in the loan commitment letter, Your Honor, that refers to the project as a 60-bed, approximately 80,000-square-foot hospital. And to Judge Donald's point from earlier, the footprint of the hospital will, indeed, hold 60 beds. The construction bids that were part of the project for the construction loan that was being provided by the bank specified that one wing would only be shelled. But the 60-bed sort of shorthand... That's a one-sentence descriptor in the loan commitment letter that was being sort of used as a shorthand. The loan commitment letter specifies that this is not every word having to do with this loan that we're going to make. There will be additional documents. And, indeed, there were. There was a far more extensive loan, the construction plans and bids themselves. All of this material was part of the loan commitment, part of the loan that was being made by the bank. And if Dr. Burriti had any hesitancy, he certainly could have asked to review any of those documents before he signed the loan commitment letter, which specifically stated Dr. Burriti would guarantee $430,000 of the $21.5 million loan, which is in excess of Dr. Burriti's pro rata share as an investor. Ms. Hinkle talked about there were no red flags. Kentucky law doesn't require red flags. But if there were a need for them, surely to take Dr. Burriti's own testimony that he asked for documents he did not receive from his partners and was asked to guarantee part of a loan that was in excess of his pro rata contribution. And, furthermore, as anyone could see by reviewing the loan commitment letter, that all of the investors were collectively being asked to guarantee almost the entirety of the $21.5 million should have indicated to Dr. Burriti that perhaps more than a cursory review would be appropriate before signing his name to a guarantee for $430,000. What's Kentucky law on that point? What's the duty? As to red flags? The plaintiff is relying on a particular case. A duty to investigate. I mean, reasonable reliance, but the counter is a duty to investigate. The position by Dr. Burriti is that he had no further duty to investigate because there were no red flags. And he draws that conclusion from First Technology Capital versus JPMorgan Chase. That case talked about a number of factors that led the court to the conclusion as a matter of law that no reasonable fact finder here could conclude that Chase reasonably and detrimentally relied on any misrepresentation by FTC. And among the factors that the court listed were the fact that Chase was experienced, was sophisticated in this kind of transaction, knew what should be in the documents that it was looking at, and as a fourth comment it stated, and they should have had a red flag from the fact that this person they were talking to on the other side clearly had no idea what he was talking about. That's the only reference in Kentucky law that talks about red flags. The other case cited by the plaintiff is actually a case on the discovery rule. Fraud is the cause of action, but that's not what the court is actually talking about when they're referring to red flags. The plaintiff has relied on a restatement section, restatement of torts section 540, and cited cases from other jurisdictions that have adopted section 540. Kentucky law has not. There is no case anywhere in Kentucky that adopts section 540 of the restatement of torts. And furthermore, there is ample case law in Kentucky that says over and over and over again that you have a responsibility to exercise diligence on your own behalf and you must use common sense, you must take some minimal level of diligence and attention before attempting to hold someone else responsible for an alleged misrepresentation. We've discussed at length in our brief the suggestion that perhaps this is not even a misrepresentation, that there would be 60 beds for the reason of the square footage and the reason of the licensure. Rather than talk further about that or the skepticism with which the district court viewed that alleged statement about a misrepresentation, I would like to talk for a moment about the breach of duty in good faith and fair dealing. Kentucky law clearly establishes that a claim for good faith and fair dealing cannot arise in the context of forming a contract. And that's what the plaintiff is trying to argue. Dr. Buriti is trying to assert that somehow he was denied a fair contract in the very negotiation of the contract. And that's not the law. The law says it must be some conduct that occurs in the performance of the contract itself. And it's not a breach of the duty of good faith and fair dealing to exercise one's contractual rights. That was the primary holding in Farmers Bank and Trust versus Wilmot Hardwoods, a 2005 case from the Kentucky Supreme Court. The decision to approve the loan predates both the loan commitment letter and the guarantee. It cannot be the basis for a claim that the bank breached its duty of good faith and fair dealing by extending the loan or requiring the guarantee. The guarantee itself is called for in the loan commitment letter. That's a term of the loan commitment. The loan commitment letter also calls for or provides for the interest rate swap that Dr. Buriti has complained was a poor business decision by his partners and the bank should not have allowed it. That was something specifically allowed in the contract itself. Dr. Buriti's guarantee agreement did not impose a duty on BB&T to take steps to ensure that Dr. Buriti was aware of the details of a financial venture in which he was a partner and an investor. What would have happened if Dr. Buriti had refused to sign this guarantee? Would that kill the loan or would they have had to find another guarantor? Either condition could have happened, Your Honor. It's possible that the other doctors among themselves could have come together and offered additional credit and covered the gap. Increase their guarantees. Yes. It's unclear. We don't know. No, we don't know. But what we do know is that the bank extended the offer of credit on the condition that these guarantees would be provided. If Dr. Buriti had been uncomfortable, either in the amount of information that he had at his disposal or in any other context in relation to the amount that he was being asked to guarantee, he had that opportunity. He did not have to sign this guarantee. He did not have to invest with KI in the first place if he felt that his partners were not adequately providing him with information. Perhaps Dr. Buriti should not have relied on his partners. He has ongoing litigation with those partners. He'll be going to trial in that case and will have his day in court in April. With regard to this case, with regard to the bank, the bank does not have an obligation to protect a guarantor with whom it is contracting at arm's length from his partners or from decisions made by the bank intended to protect the bank's own interests. It's not a breach of the duty of good faith and fair dealing for the bank to require the guarantees, to exercise the rights granted in the loan commitment letter, or to enforce a guarantee that it bargained for. And for those reasons, we believe that the summary judgment in favor of the bank was appropriate, and we ask you to affirm the decision of the district court below. Thank you. Thank you, counsel. Thank you. I'd like to use my rebuttal time to note that the cases cited by the district court and in large part the cases cited by the bank on the question of justifiable reliance, which were used as a basis to resolve this question as a matter of law, all involved cases where the plaintiff either knew or had possession of documents. None of those cases, I think is your point, or is this your point, none of those cases required some diligence on the part of the investor that we're talking about here? Well, it's a question of what diligence requires. Some courts have required a party to read the documents in their possession in order to discover the misrepresentation. Some courts, even though you draw a distinction between in your possession and having asked but not received in Dr. Broody's case? Or not even have asked because you didn't know that there was any reason to question the representation. I think those are the facts. That's a lot of money, isn't it?  So one would think there's your reason to question. Well, certainly there is a reason to want to assure yourself that the project as you understood it would generate revenue sufficient to meet its debt obligations. Dr. Broody? If he hadn't looked at the documents sufficiently, what did persuade him that 60 beds is the golden number and that'll happen and that'll make everything wonderful? This hospital was based on another hospital that was already built and operating successfully in Kansas. So these investors were shown financial projections from that hospital, which are the same projections that were shared with the bank, which showed that revenues from 60 beds would be sufficient to meet this kind of debt burden. That's what Broody saw in investor meetings. There's no evidence that Broody ever saw anything in an investor meeting that reflected that an entire wing of the hospital would not be built. What did they do at these investor meetings? Did anybody? We apparently didn't look at the documents. We have looked at the documents, Your Honor, in part in other litigation, but they did a variety of things, including talking about how to obtain equipment leases and other aspects of hospital management. This is somewhat a facetious question, so I'm sorry. Okay. Did Dr. Broody sue the other partners in this case? He has sued the two managers of KI, the entity through which he made his investment in the hospital. They're the ones who should have told him it says 60 beds, but we won't have 60 beds for a while. Well, that's something that the bank has argued, and I don't disagree that as good partners they should have told him that, but the fact remains that Dr. Broody has a contract with BB&T, and that's a bilateral relationship that includes an implied covenant of good faith, includes an obligation not to make fraudulent misrepresentations. You heard counsel's argument about why the covenant of good faith is not triggered here. I did. What's your response to that? My response is that this contractual relationship started with a loan commitment letter. We have alleged and established through evidence. And that suffices to satisfy her argument? We believe it addresses it, Your Honor, yes. Suffices to, oh, more than just address it, or does it meet the requirements to trigger the right to bring a claim for? It meets the requirements. Okay. And your counsel for the bank also said that, I think in the deposition, Mr. Broody admits to being a sophisticated business person. He admits to glancing at some of the documents but not really doing a thorough review. Isn't that kind of fatal to his position that he just didn't have access to this? And doesn't that sort of boast of the bank's claim that he had an obligation to do some diligence, that there were things available to him, and he just didn't avail himself of that? She says there are 44 pages of his investment deals, which would really support that sophisticated business person's terminology. We don't dispute that Dr. Broody has experience in making other investments and is a successful business person in other ventures. The problem in this case is that the documents that they fault Dr. Broody for not carefully reviewing, the operating agreement, for example, that wouldn't have told him that the hospital was only going to have 34 beds. The loan agreement, he didn't ask his attorney to review. I think we have your argument. Your time has expired. But your point is, had he looked, you say he would not have discovered the problem. That's correct. All right. Thank you, counsel. We'll have your matter. We'll consider it carefully and issue an opinion in due course.